542 So.2d 860 (1989)
Harold W. BUSCHING
v.
Margree GRIFFIN.
No. 57965.
Supreme Court of Mississippi.
January 4, 1989.
Rehearing Denied May 10, 1989.
*861 David L. Reynolds, Reynolds & Kilpatrick, Jackson, for appellant.
Steve H. Smith, Smith & Case, Ridgeland, for appellee.
En Banc
ROBERTSON, Justice, for the Court:

I.
Without hint of fraud or suggestion of incompetence, a Madison County woman has granted to another a written option to purchase her family's land in Ridgeland, Mississippi. Second thoughts suggested that the $50,000.00 purchase price was too low, and, when optionee gave notice of his intent to exercise the option, the woman said she thought the option fee was a loan to pay her taxes and, in any event, that the written option agreement was too vague to enforce. The court below accepted the woman's view and let her off the hook. We reverse and render, for otherwise the integrity and enforceability of written contracts would be greatly in doubt.

II.

A.
On July 27, 1981, Margree Griffin executed an instrument labeled Option to Purchase. Her acknowledgment was taken by a Madison County notary public. Griffin then delivered the option to Harold Busching. The instrument recited that until December 15, 1981, Busching had an option to purchase for $50,000.00 a tract of land in Ridgeland, Mississippi, a description of the property being attached as an exhibit. Busching paid $500.00 for the option.
The property is said to consist of "five (5) acres, more or less, more particularly described" as
All that tract of land lying and being in Section 24, Township 7 North, Range 1 East, and being that portion of Lot 3, Block 16, Highland Colony Sudivision, lying north of Old Agency Road and west of Interstate Highway 55, as said highways are presently constituted, and being in Madison County, Mississippi.
In relevant part, the option agreement provides:
4. Purchase Price. The total purchase price for the property described shall be $50,000 to be paid by Busching if this option is exercised, the terms of such sale will be provided in an agreement to be exercised between Griffin and Busching. The sum paid for this option shall be credited on account of the cash payment to be made on the closing as will be provided in the agreement.
Paragraph 6 of the option states:
6. Exercise Option. If this option is exercised as herein provided, Griffin and Busching will respectively, as Seller and Purchaser, perform the obligations in the form of agreement to be made between them.
The option was signed by Griffin and recorded by Busching in the land records of Madison County.
On January 26, 1982, and on March 4, 1982, for valuable cash considerations, Griffin granted extensions of Busching's option until January 22, 1984. It seems that Griffin had a problem with family members about title. These extensions were likewise recorded in the Madison County land records.
On July 8, 1983, Busching, through his attorneys, wrote Griffin saying he understood that she had received clear title and notifying her that he intended to exercise the option. He requested that closing take place within ten days. Nothing happened. Busching then wrote Griffin directly on August 10, 1983, and told her that he intended to exercise the option to purchase. Again Busching requested that the closing take place within ten days. Griffin refused to perform.

B.
Busching formally commenced this civil action on September 2, 1983, when he filed his complaint in the Chancery Court of Madison County, Mississippi. Busching asked that the Court order Griffin to perform her obligations under the option. *862 Griffin moved to dismiss under Rule 12(b)(6), Miss.R.Civ.P., on grounds that the complaint failed to state a claim upon which relief could be granted, and the Chancery Court granted her motion.
Busching appealed and we reversed, holding that Busching was entitled to proceed further under his complaint. See Busching v. Griffin, 465 So.2d 1037 (Miss. 1985) (Busching I). En route we stated
We therefore reverse and remand this case for additional proof upon the intent of the parties and the ability of Busching to meet whatever terms of payment Griffin may lawfully require.
Busching I, 465 So.2d at 1042-43.
Pursuant to our remand, a hearing on the merits was held on December 2, 1985. Griffin not only sought to vary the terms of the option agreement she had signed and acknowledged; she denied it entirely, though without claiming any species of fraud. Griffin said Busching did nothing but loan her some money to pay her taxes. When questioned as to how she expected to be paid the $50,000.00 under the agreement, Griffin stated that she "did not expect this money to be paid at all" since the land belonged to "all twelve of us" and "the money I had got from him [Busching] was a loan."
In support of his suit for specific performance, Busching testified that, when he contracted with Griffin, she indicated she needed some money to pay taxes on the land. Griffin told Busching she wanted to sell the land but didn't know if she could since there was a problem with the title.
I suggested to her that until we could clarify what the situation was with the land, that I advance her the money and we take some sort of an option on the land until such time as the land  the title could be cleared up on the land  which she agreed to. She indicated the amount of money that she wanted for the property and the amount of money that she needed then and I made a basic agreement with her over the phone and we proceeded in that fashion.
Busching repeated that he wished to exercise the option according to its terms and that he stood ready, willing and able to pay Griffin $50,000.00 in cash at the time of closing, or that he would pay for the property via any reasonable terms proposed by Griffin. He admitted that they never discussed surveying the property, the type of deed being considered, taxes, or easements on the property.
On April 1, 1986, the Chancery Court issued a ruling denying Busching's claim for specific performance. The Court held that the Option to Purchase was too vague and uncertain and "was simply an agreement to enter into a contract at some future date." Final judgment was entered May 23, 1986.
Busching's second appeal is now before us.

III.
Two preliminary words need be said.

A.
While Busching I carefully considered many of the problems lurking in this case, the bottom line was a holding that the Chancery Court had erred when it granted Griffin's motion to dismiss under Rule 12(b)(6), Miss.R.Civ.P. Busching's complaint stated a claim upon which relief could be granted. It was certainly within this Court's power to have limited the issues that could be heard upon remand  and this would have been done had we felt the motion in part had been correctly granted and in part erroneously granted. Notwithstanding, we imposed no such limitation in Busching I. Upon remand the case assumed exactly that status it would have had if the Chancery Court had denied Griffin's motion to dismiss. Grantham v. Mississippi Department of Corrections, 522 So.2d 219, 226 (Miss. 1988); Whitten v. Commercial Dispatch Publishing Co., Inc., 487 So.2d 843, 846 (Miss. 1986).
Busching I should not be read for more than what it is: a careful and methodical explanation of why the Chancery Court had erred in dismissing Busching's complaint. No law of the case principles set in, except of course on the proposition that Busching's *863 complaint stated a claim upon which relief could be granted. When Busching I observes that there are ambiguities in the option agreement, this is for the purpose of explaining why the motion to dismiss should have been denied. Busching I announces no holding on this point which Griffin can subsequently turn into a sword.

B.
The second word concerns our scope of review. We are presented what is essentially a question of law: whether the option agreement is sufficiently clear that it may undergird a decree for specific performance. The judicial task is to view the terms of the document, find their legal meaning, and adjudge their enforceability vel non. The familiar manifest error/substantial evidence rules have no application to our appellate review of such questions. Mississippi State Highway Commission v. Dixie Contractors, Inc., 375 So.2d 1202, 1206 (Miss. 1979); S & A Realty Co. v. Hilburn, 249 So.2d 379, 382 (Miss. 1971). Cf. UHS-Qualicare, Inc. v. Gulf Coast Community Hospital, Inc., 525 So.2d 746, 754 (Miss. 1987).
Griffin makes much of the notion that she never understood she was giving Busching an option, rather that she was merely borrowing money with which to pay her taxes. Indeed, Griffin makes a series of factual allegations designed to avoid her obligations under the option. She stops short, however, of claiming fraud, misrepresentation, overreaching or any other unconscionable conduct. She in no way denies her competence to grant the option. Taking Griffin's factual defenses as true, they fail as a matter of law. As we say, the manifest error/substantial evidence rule offers no aid on this appeal.

IV.

A.
The outcome determinative issue is Busching's attack upon the Chancery Court's holding that the option was no binding contract at all, only an "agreement to agree." Our policy regarding such matters was established in Jones v. McGahey, 187 So.2d 579 (Miss. 1966) wherein we stated:
Determination that an agreement is sufficiently definite is favored in the courts, so as to carry out the reasonable intention of the parties if it can be ascertained. A contract is sufficiently definite if it contains matter which would enable the court under proper rules of construction to ascertain its terms, including consideration of the general circumstances of the parties and if necessary relevant extrinsic evidence. Having found a contract to have been made, an agreement should not be frustrated where it is possible to reach a reasonable and fair result. [citations omitted]
187 So.2d at 584. We have approved these views in Etheridge v. Ramzy, 276 So.2d 451, 455 (Miss. 1973); McGee v. Clark, 343 So.2d 486, 489 (Miss. 1977)  and in Busching I, 465 So.2d at 1040.
The point is not new. In Vicksburg Water Works Co. v. J.M. Guffee Petroleum Co., 86 Miss. 60, 38 So. 302 (1905), we said:
A stipulation to reduce a valid written contract to some other form does not affect its validity, and the stipulation may not be used by either of the parties for the purpose of ... evading performance of any of the provisions of the contract.
86 Miss. at 66, 38 So. at 304.
Others outside our borders appear of like mind. The late Prof. Corbin has written:
Two persons may fully agree upon the terms of a contract knowing that there are other matters on which they have not agreed and on which they expect further negotiation. Such an expectation does not prevent the agreement already made from being an enforceable contract.
1 Corbin, The Law Of Contracts 94-95 (1963). See also Volk v. Atlantic Acceptance & Realty Co., 139 N.J. Eq. 171, 50 A.2d 488 (N.J.Ch. 1947) (specific performance decreed of option to purchase at stated price even though the option contained the following: "The terms of the said sale to be determined and settled by the parties *864 hereto at the time of the exercise of the option.")
The holder of an option is entitled to specific performance of the optionor's duty to convey, so long as the holder is willing to pay the option price. Clinton Service Co. v. Thornton, 233 Miss. 1, 10, 100 So.2d 863, 867 (Miss. 1958). Harold Busching testified that he stands ready, willing and able to deliver $50,000.00 cash to Griffin  and that he has been so since July of 1983. This suggests strongly that he is entitled to a decree that Griffin execute and deliver a proper instrument of conveyance.[1]
McGee v. Clark concerns, with one exception, an identical situation. The option in McGee provided for a downpayment of a portion of the total purchase price, with the balance to be financed and secured by a deed of trust, with payments annually in specified installments at a specific rate of interest. McGee held that option contract specifically enforceable, rejecting a charge of vagueness and ambiguity. We find nothing in McGee that would lead us to think that the Court would have decided the question otherwise had the option provision on the matter of purchase price been worded as is the case of the one here. The key term whose specificity must appear is the purchase price  here $50,000.00. That this sum may be paid according to different terms ranging from lump sum to a complete installment arrangement are but differing mechanisms for accomplishing the same economic event. And when Busching states under oath that he is willing to pay the $50,000.00 in cash or according to such installment terms as may be reasonable and lawful, he eliminates any possible claim of ambiguity for the obvious reason that there is no longer any way the provision may be construed to Griffin's detriment.
All of this is quite consistent with the careful discussion in Busching I to the effect that, where an option fixes the purchase price but does not specifically fix the time for payment of the purchase price, the law construes the offer to be for cash on delivery and before title passes. Busching I, 465 So.2d at 1041.

B.
Two further points. First, we have considered the adequacy of the description of the property. That description appears on Exhibit "A" to the Option to Purchase and is recited verbatim at the outset of Part II(A) above. The suggestion is that there are more than five acres in the disputed tract. Neither law nor language leave doubt how we should read an instrument respecting an interest in land when it uses words such as "five (5) acres, more or less" followed by "more particularly described" or the like. The "more particular" description controls, modifying, if not replacing, the "more or less" language. As to the legal adequacy of the "more particular" description, we must keep separate (1) "adequacy" for purposes of giving notice to third parties and perfecting interests against lien creditors and (2) "adequacy" between the parties. Nothing said here passes upon the adequacy of the description here vis-a-vis third parties or lien creditors. Suffice it to say that Griffin offers no suggestion that she is in doubt on the description and identity of the land she is to convey.
Second, we have considered whether Busching's exercise of the option is effective in view of the fact that he never placed a $50,000.00 check on the table and said to Griffin, "I tender the purchase price called for in the Option to Purchase". To be sure, that would have been one means by which Busching may have exercised the option, but not the only means. The notices Busching gave Griffin, personally and through counsel, were within the option period as extended. As such, they had the effect of an acceptance, converting the option into an enforceable bilateral contract. See Holifield v. Veterans' Farm & Home *865 Board, 218 Miss. 446, 450-52, 67 So.2d 456, 457-58 (1953); Hollingsworth v. Bilbo, 211 Miss. 155, 158, 51 So.2d 229 (1951). Of course, Griffin has no obligation to tender a deed until Busching is prepared simultaneously to deliver in exchange his check for the purchase price.

V.
The Chancery Court took a very different  and quite erroneous  view of the case. First, the Court found the Option to Purchase "vague and uncertain and ambiguous ... simply an agreement to enter into a contract at some future date... ." Griffin tries to bolster this conclusion in her brief, noting a variety of details upon which the parties had made no specific agreement. All of Griffin's talk about what the parties had not agreed on cannot obscure what they did agree on: that, if Busching exercised the option, Griffin would sell him the property for $50,000.00. In any event, McGee v. Clark and the discussion in Part IV above unmask the error of this portion of the opinion below.
Second, the Chancery Court credited  but in a curious way  Griffin's testimony that she never intended to give Busching an option, that all she wanted was loans to pay her taxes. Griffin had said she never thought of the $500.00 Busching paid her in July of 1981 and the $400.00 paid in March of 1982 as anything but loans that had to be repaid. She didn't remember what the $25.00 Busching paid her in January of 1982 was for. What is of note is the Court's failure to predicate its judgment on this view. Careful reading of the opinion below reveals the ambiguity point as the sole predicate of the judgment for Griffin. Yet en route the Court said it
believes the "Option to Purchase" ... was nothing more in the eyes of the Defendant [Griffin] than something to secure the money she received, to pay the taxes until the title was cleared, from the Plaintiff [Busching]; ... ."
The point implicates our parol evidence rule. That rule provides that where a document is incomplete parol evidence is admissible to explain the terms but, in no event, to contradict them. Carter v. Collins, 151 Miss. 1, 8, 117 So. 336, 338 (1928); what happened below is that Griffin attempted, and the court permitted her, to destroy the written contract. In Alliance Trust Co., Ltd. v. Armstrong, 185 Miss. 148, 186 So. 633 (1939), the Court employed language and reasoning equally applicable here:
To permit a party when sued on a written contract, to admit that he signed it but to deny that it expresses the agreement he made or to allow him to admit that he signed it but did not read it or know its stipulations would absolutely destroy the value of all contracts.
Alliance Trust, 185 Miss. at 163-64, 186 So. at 635.
Undaunted, Griffin seeks to deny the express provisions of the agreement she signed. She argues that the rule offers no bar to her testimony of her understanding where the writing is incomplete, ambiguous or where the evidence is not offered to vary the terms of the written agreement. See, e.g., Keppner v. Gulf Shores, Inc., 462 So.2d 719, 725 (Miss. 1985). But at most this means that parol evidence is admissible on those points where there is ambiguity. Such evidence may not be received to contradict parts of the option that are not ambiguous. The least ambiguous part of the option is that, if it were exercised, Griffin would sell Busching the property for $50,000.00.
We noted above that Griffin makes no claim Busching practiced any fraud upon her. A review of the writings Griffin signed makes clear just how legally innocent Busching is.
On July 27, 1981, Griffin signed the option agreement at issue in the presence of a notary public. On January 22, 1982, Griffin signed an Extension of Option to Purchase, again in the presence of a notary public. On the same day she signed a typed Receipt which recited that she had been paid $25.00 of the option extension.
Then, on March 4, 1982, Griffin executed an Agreement which extended until January 22, 1984, the date by which Busching *866 had to exercise his option. This Agreement was also signed before a notary public. On the same day, Griffin signed a Receipt. That writing recited Griffin's acknowledgment that she had been paid $400.00 "being the consideration for the Extension of Option to Purchase granted by me to Harold Busching."
The record contains not so much as a hint that Griffin was incompetent. That she was inexperienced in buying and selling property is legally irrelevant, absent some suggestion that Griffin has been defrauded, subjected to undue influence or overreaching or something of that sort. If we were to allow Griffin to escape her obligations under this option, the precedent would imperil all contracts where, before performance, one party smelled a sweeter deal. We have established in our law that
the mere fact that the defendant [Griffin here] made a bad trade or bargain is not sufficient to defeat an obligation for specific performance.
Clinton Service Company v. Thornton, 233 Miss. 1, 11, 100 So.2d 863, 867 (1958); see also Pickett v. Boutwell, 240 Miss. 18, 22, 125 So.2d 822, 824 (1961).
REVERSED AND RENDERED.
ROY NOBLE LEE, C.J., and PRATHER, ANDERSON and ZUCCARO, JJ., concur.
DAN M. LEE and HAWKINS, P.JJ., and SULLIVAN, J., dissent by separate written opinion.
DAN M. LEE, Presiding Justice, dissenting:
Harold W. Busching originally filed a complaint for specific performance on September 2, 1983, in the Chancery Court of Madison County, Mississippi, seeking an order directing specific performance of an option to purchase and extensions thereof and directing Margree Griffin to execute a warranty deed conveying certain real property described in the complaint. On January 6, 1984, the lower court sustained a motion by the defendant, Margree Griffin, to dismiss under Rule 12(B)(6). An appeal to this Court followed, wherein the case was reversed and remanded for further evidence. This Court found certain ambiguous language in the option. See Busching v. Griffin, 465 So.2d 1037 (Miss. 1985).
On remand a trial was had on the merits and in an opinion filed April 1, 1986, the learned chancellor found for Margree Griffin. A final judgment was entered in this case on August 22, 1986, wherein the Court determined the option to be vague, uncertain and ambiguous. From this final judgment, Mr. Busching has pursued this appeal. Having reviewed the findings of the court below, the majority seeks to reverse the findings of the learned chancellor and render an opinion here in favor of Mr. Busching. To that decision, I respectfully dissent.
This Court is asked to determine if the chancellor was correct in finding that a particular document was an instrument to secure a loan rather than a final option to purchase. In reversing the chancellor, the majority has misconstrued several established areas of the law, including the parol evidence rule, appellate review, and, most fundamentally, basic contract law.

FACTS
On July 7, 1981, Mrs. Margree Griffin (hereinafter Griffin), the appellee, signed a paper to obtain $500 with which to pay taxes on five to eleven acres in which she inherited a 1/12 interest. This inherited acreage was in litigation. The papers were prepared by Busching and sent to Griffin for her signature. According to Busching, the circumstances at the time were:
But, some of the [sic: sum and] substance of this conversation was that she needed some money advanced for her to pay some taxes along with some expenses that she had at the time, and would like to proceed on that basis.
The papers signed by Griffin were to be advances by Busching to Griffin with an open-ended unilateral option which both parties treated as an understanding that Busching had the first right to buy the acreage in the event (1) title could be cleared, (2) accurate number of acres ascertained (five or 11 acres at $5,000 per acre), *867 and (3) a final agreement reached between the parties.
Testimony at trial reveals that Griffin believed that the $400 and $500, were loans that enabled her to pay the taxes on the property and other expenses.
On July 8, 1983, Busching wrote Griffin stating that he understood she had received marketable title to the property. Busching also declared his intentions to exercise the option within ten days. Busching's expected transaction did not take place. Undaunted, Busching again wrote Griffin on August 10, 1983. The letter contained the same demand that the closing take place within ten days. Griffin still refused to perform, contending instead that the advances were loans to be deducted or repaid, depending upon what occurred as to clearing the title and reaching a final agreement.

I.
As I see it, by analogy, this case is factually similar to Harris v. Kemp, 451 So.2d 1362 (Miss. 1984), where we interpreted an otherwise clearly written warranty deed as a mortgage because the conduct of the parties evidenced their treatment of the document as an instrument to secure a loan rather than as an outright deed. We stated in Harris:
In determining whether this burden was met and whether a transaction was intended as a mortgage rather than a deed, there is no conclusive test. Instead, each case must be decided upon its own facts and all the surrounding circumstances. Lampley v. Pertuit, 199 So.2d 452, 455 (Miss. 1967); Emmons v. Emmons, 217 Miss. 594, 599, 64 So.2d 753, 755 (1953). Among the factors this Court has previously noted as being pertinent in such a determination are: the relation of the parties, the financial condition of the grantor, possession by the grantor, the value of the property, and the conduct of the parties. Emmons v. Emmons, supra, at 599, 64 So.2d at 755. Also noted, by other authorities, as pertinent are the payment of taxes and subsequent dealings of the parties. 59 C.J.S. Mortgages § 35, p. 70.
* * * * * *
Moreover, where, as here, the grantor retains possession of the property, parol evidence may be introduced to prove that the deed, absolute on its face, was intended as a mortgage. Mississippi Code Annotated § 89-1-47 (1972); Bethea v. Mullins, 226 Miss. 795, 85 So.2d 452 (1956).
In Harris v. Kemp, supra, we reversed the chancellor because he did not look at the conduct of the parties in construing the document. The chancellor in this case did look at the conduct of the parties and determined that the document was an instrument to secure a loan rather than a final option to purchase. He was correct in doing so under the authority of Harris and the mandate of this Court in Busching I, supra.
The majority chooses to ignore the fact that Busching, without a doubt, knew of the ownership problems which existed with the property at the time the option was prepared, and testified that these ownership problems negated the preparing any final terms and conditions for the sale of the property.
As pointed out by this Court in Busching's first appeal, Busching v. Griffin, supra, there was not sufficient proof of the intent of the parties. In other words, there was no meeting of the minds. A pertinent portion of that opinion reads as follows:
In our opinion, the language of paragraphs 4 and 6 of the option contain substantial ambiguities and therefore is not susceptible of a motion to dismiss under 12(b)(6). We therefore reverse and remand this case for additional proof upon the intent of the parties and the ability of Busching to meet whatever terms of payment Griffin may lawfully require.
A brief review of these paragraphs spell out this Court's concern with this "so-called" option contract. Paragraph 4 reads as follows:

Purchase Price. The total purchase price for the property described shall be *868 $50,000 to be paid by Busching if this option is exercised, the terms of such sale will be provided in an agreement to be exercised between Griffin and Busching. The sum paid for this option shall be credited on account of the cash payment to be made on the closing as will be provided in the agreement.

The underscored portion obviously leaves a gaping hole for further interpretation of terms and conditions to the option. Paragraph 6 reads as follows:
Exercise of option. If this option is exercised as herein provided, Griffin and Busching will respectively, as seller and purchaser, perform the obligations in the form of agreement to be made between them.
These paragraphs reveal that the parties were not in total agreement as to all essential terms of the proposed sale, but another agreement would follow if the title was cleared and final terms agreed upon.
For Busching, or the majority, to say that the provisions of this option do not require any further negotiation flies in the face of all reason. Moreover, specific performance is not supported by the evidence in the record. Busching's testimony clearly indicates that neither party believed or intended the option to be a final document:
And, all of that[1] was really a moot point until the title situation could be looked into and eventually cleared up. Because, if it couldn't, the title of the property could not be conveyed. And, I knew enough about land and property that none of that really mattered until we could see what the situation was as concerned the title.
By Busching's own admission, the material terms and conditions were not set forth in this document.
Another ambiguity which undermines the majority's position is the money Busching paid to Griffin. Busching contends that these funds were consideration for the option contract, but admits that the funds were an advance to pay the taxes on the property. Busching testified:
A: Mrs. Griffin indicated to me that she owed some money, some taxes on this property. She was in need of some funds to pay the taxes; that she had been asked by a number of people to sell this property. She wanted to, in fact, sell it, and would like for me to consider buying it. She indicated there was a problem within her family concerning the ownership and title to the property and until that could be cleared up, she didn't know whether or not she could sell it, as I recall. But, some of the substance of this conversation was that she needed some money advanced for her to pay some taxes along with some expenses that she had at the time, and would like to proceed on that basis.

Q: What did you suggest to her as to what you would be willing to do?
A: I suggested to her that until we could clarify what the situation was with the land that I advance her the money and we take some sort of option on the land until such time as the land  the title could be cleared up on the land  which she agreed to... .
Busching's own version of the transaction, "she didn't know whether or not she could sell it ... she needed some money advanced for her to pay taxes," is not materially different from Griffin's. Whether it be called "money advanced" or "loan," both parties treated the document as one to secure Busching for advancing money. Griffin stated on cross-examination:
Q: That doesn't say anything about a loan, does it?
A: Well, that's what we talked about was a loan. When I talked to him on the phone, it was a loan.
Q: It doesn't say anything about a loan, does it?
A: No, not a loan, but I was under the impression it was a loan when I *869 signed it and, I was going to pay the money back.
There was obviously no material discrepancy between the parties' understanding of the purposes of the option.
Further evidence that the so-called option was, in fact, an interim document to secure Busching's advance is illustrated by the fact that it fails to include the number of acres involved, the exact location or description of the subject property, whether the property was landlocked, and its accessibility to private or public roads. Busching further stated:
Q: Did you furnish Mr. Reynolds [Busching's attorney] the information to go in the document?
A: Part of it. I'm sure I  I outlined for him  in generalities, the, you know, the agreement that we had reached.
Q: Do you remember exactly how you outlined it to him?
A: No, sir, I do not.
Q: Did you provide him with a description?
A: No, sir.
Q: Did you know what the description was?
A: The legal description?
Q: Yes, sir.
A: No, sir, I did not.
Q: Do you know the amount of acreage involved?
A: No. I think we discussed the amount of acreage. In the original conversation that Mrs. Griffin and I had she was not sure herself, exactly, how much land was there. She said that there was at least five acres and could be more acreage in the property, six or seven or eight or nine acres. And, I did not know just exactly how much property there was. I was assuming all along that it was somewhere between five and ten acres of property.

In view of the testimony of the parties and the circumstances prevailing at the time, the learned chancellor was correct in holding that the transaction was intended as a mortgage rather than an absolute option to sell. Seen in this light, our familiar standard of review, see Culbreath v. Johnson, infra, prevents our reversing the chancellor's findings.
The majority further insists that "Griffin attempted, and the court permitted her, to destroy the written contract." According to the majority, Griffin's testimony concerning the advancement of the money as a loan contradicts or destroys the original contract, citing Carter v. Collins, 117 So. 336 (Miss. 1928), where this Court explained Mississippi's rule concerning parol evidence:
A simpler rule, perhaps in most cases, in this, that evidence may explain but cannot contradict written language ...
Based on this authority, the majority contends that the court was in error in allowing Griffin's testimony. On the contrary, I would point out that the lower court only attempted to comply with the original ruling in Busching v. Griffin, supra, and was simply looking for additional proof of what the parties' original intentions were. In order to accomplish the goals set out in the original opinion, the lower court was required to hear further evidence on the intent of the parties.
Accordingly, I do not believe the parol evidence rule excludes the additional testimony presented by Griffin. In Keppner v. Gulf Shores, Inc., 462 So.2d 719 (Miss. 1985), this Court wrote:
The parol evidence rule has no application where the writing is incomplete, ambiguous or where the evidence is not offered to vary the terms of the written agreement.
This analysis should not be misconstrued to mean that additional evidence is not allowed when the writing is incomplete, ambiguous, or offered to vary the terms of the written agreement. In other words, the parol evidence rule keeps out additional evidence or information when the contract is valid, complete, unambiguous, and uninfected by accident, mistakes or fraud. Following the reasoning in Keppner, I believe the trial court was correct in allowing both *870 parties to testify as to their intentions in this agreement.
Finally, the majority fails to follow this Court's precedents of appellate review. As I see it, this is a classic case for a judge to make a finding of fact, which the chancellor has twice done. As one justice has so often and eloquently stated:
Appellate courts regularly admonish themselves to give substantial deference to findings of fact made by the trier of fact. In a case such as this such admonitions are peculiarly appropriate. As a matter of common sense as well as common law, the fact finder surely must have the benefit of viewing the manner and demeanor of the witnesses. Even then unraveling and decreeing a just result is difficult. The trial court necessarily has an infinitely superior vantage point when compared with that of this Court, which has only a cold record to read.
* * * * * *
Were we to substitute our view of the facts for the chancellor's, one thing could be said with certainty: the chances of error in any findings we might make would be infinitely greater than is the case where those findings are made by the man on the scene. The one time in a hundred when we might be right and the trier of fact wrong cannot justify our disturbing the established practice regarding our scope of review.
Culbreath v. Johnson, 427 So.2d 705, 709 (Miss. 1983). By stepping outside the scope of review to reverse the chancellor's findings, the majority has rendered a decision which completely ignores basic contract law  which the chancellor correctly applied to the facts before him.

CONCLUSION
Having focused on the problems of the majority opinion, I would like to take a last opportunity to address the majority's fears that the chancellors' findings threaten "the integrity and enforceability of written contracts." In trying to determine whether or not a contract exists, this Court has stated that courts will enforce contracts made but will not make contracts for parties who have not assented to be bound. See, e.g., Copeland v. Pickett, 422 So.2d 752, 754 (Miss. 1982). Additionally, Corbin on Contracts § 95 states:
When the evidence clearly shows, either by reason of definite language or otherwise, that the only (and the complete) subject matter that is under consideration is left for further negotiations and agreement, there is no contract, not for vagueness or indefiniteness of terms but for lack of any terms.
The sole issue in this appeal is whether "the option to purchase" is an option or was it used by the parties to secure advances for taxes, etc. As pointed out earlier in this dissent, the parties were not certain as to the number of acres involved, the exact location or description of the subject property, or whether the property was landlocked or could be accessed by public or private roads. Additionally, the trial court had sufficient proof within which to find that the parties treated the so-called "option" as a security instrument rather than a "final option" to sell enforceable by specific performance.
In light of the testimony and the evidence in the record, one can readily see that it is impossible to draw the conclusion that the minds of the parties met and mutually agreed as to the purposes of the option prepared by Busching. Consequently, I believe the majority takes this opportunity to fashion a new theory as to contract law and has prospects for incredible injustice to be done to those parties who have not genuinely agreed to be bound. I, therefore, cannot join the majority.
HAWKINS, P.J., and SULLIVAN, J., join this dissent.
NOTES
[1] Innuendos appear in the papers before us that Griffin may not after all possess fee simple title to the property. That is a matter not formally before us and upon which we express no opinion, except to observe the obvious: that Griffin has no power to convey interests she does not have.
[1] "[T]hat" refers to easements, proration of taxes, surveys, and the "likes of that."