United States Court of Appeals
Fifth Circuit

**F I L E D**

July 13, 2004

Charles R. Fulbruge III
Clerk

UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

No. 03-60610

V. BRUCE BUCHMAN; JAMES J. BUCHMAN, SR;
LESLIE RICHARDSON; JAMES W. BUCHMAN;
VIRGINIA S. NEARN, Individually and as Co-Executor
of the Estate of Virginia B. Smith, Deceased; M. HUE
SMITH, III, Individually and as Co-Executor of the Estate
of Virginia B. Smith, Deceased.

Plaintiffs-Appellants,

v.

BASF CORPORATION, Successor-in-Interest to Wyandotte
Chemicals Corporation by merger and name changes;
INTERNATIONAL MINERALS AND CHEMICAL
CORPORATION, Successor to IMC Chemical Group, Inc.
by merger; APPLIED INDUSTRIAL MATERIALS
CORPORATION, formerly known as IMC Industry Group, Inc.;
PROFILE PRODUCTS, LLC, formerly known as Aimcor
Consumer Products, LLC,

Defendants-Appellees.

Appeal from the United States District Court
for the Southern District of Mississippi, Jackson
3:02-CV-126-BN

Before DAVIS, BENAVIDES, and PRADO, Circuit Judges.

PER CURIAM:[*]

Appellants sued Appellees for non-payment of clay mining royalties. The district court

---

[*]      Pursuant to 5TH CIR. R. 47.5, the Court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

granted summary judgement in favor of Appellees. Appellants timely appealed. For the following reasons, we affirm in part, and we vacate and remand in part.

## I. Background

In 1948, Blue Mountain Clay Company, Inc. ("Blue Mountain")[1] sold a clay processing facility (the "Plant") and surrounding 32-acre parcel of land (the "Plant Site") located in Tippah County, Mississippi, to Defendant-Appellee Wyandotte Chemicals Corporation ("Wyandotte").[2] Blue Mountain also leased two parcels of adjacent land (the "Leased Properties") to Wyandotte. As part of the deal, Wyandotte agreed to pay certain royalties to Blue Mountain. The transaction was effected through the execution of three instruments: 1) the Warranty Deed, 2) the Contract and Lease, and 3) the Bill of Sale.[3]

Specifically, the Warranty Deed transferred ownership of the Plant and the Plant Site from Blue Mountain to Wyandotte in fee simple. Paragraph Six, however, indicated that the conveyance was "subject" to a prior lien and royalty contract between Blue Mountain and the previous owner of the Plant Site, Semmes/Pollard.[4] If Blue Mountain failed to pay Semmes/Pollard the required royalties (the "Semmes/Pollard Royalty") for clay mined from the Plant Site, however, Wyandotte was permitted to pay the royalties to Semmes/Pollard and deduct

---

[1]    Plaintiffs-Appellants are the successors in interest, or the heirs thereto, of Blue Mountain. For clarity, and because it does not affect the analysis of the case, Blue Mountain and its successors or heirs thereto – all of the Plaintiffs-Appellants – will be referred to collectively as Blue Mountain.

[2]    Wyandotte is now known as BASF, Inc.

[3]    The Bill of Sale addressed the Plant and its equipment and inventory and is not at issue in this litigation.

[4]    Semmes/Pollard was actually an individual, B.J. Semmes, and the heirs of another individual, J.A. Pollard.

2

the amount paid under this clause from the royalties Wyandotte was obligated to pay Blue Mountain per Paragraph Seven.

The Contract and Lease was the instrument through which Blue Mountain leased the Leased Properties to Wyandotte. Also in the Contract and Lease, Wyandotte agreed to pay Blue Mountain royalties on clay mined from the Leased Properties, with a $6,000 yearly minimum. Paragraph Seven of the Contract and Lease,[5] the primary text in dispute, indicates that Wyandotte was to pay Blue Mountain the same royalty (the "Paragraph Seven Royalty") on clay mined "from any other lands within a radius of five (5) miles of the present plant site, located on the (32) acres of land this day deeded to [Wyandotte] by [Blue Mountain]."

Ownership of the Plant Site was subsequently conveyed three times. First to Defendant-Appellee IMC Chemical Group, Inc., then to Defendant-Appellee IMC Industrial Group, Inc., and finally, to its owner as of the commencement of litigation, an entity now known as Profile Products, LLC, the final Defendant-Appellee.[6]

In 1962, the parties amended in writing the Contract and Lease in two ways. The first modification, not of importance to our analysis of Blue Mountain's claims, eliminated a distinction between the royalty payed on clay made into a product known as "Zorball" and clay made into other products. The second was to include in the Contract and Lease a provision for royalty payments for clay mined from two nearby properties, the Callicutt and Carter leases, that

---

[5] What we refer to as the numbered paragraphs, i.e., Paragraph Seven, Paragraph One, etc., are the numbered paragraphs that follow the three numbered sections set-off in the Contract and Lease. The numbered paragraphs begin on the middle of the second page of the document.

[6] Because it does not affect our analysis, when referring to one or more of the Defendants-Appellees we will refer to them simply as Appellees regardless of which entity or entities are being discussed.

Appellees had been assigned by Vernon Buchman, one of the individual Blue Mountain successors. At the time Blue Mountain filed this action, the Carter lease was abandoned and not at issue, though the Callicutt leases remained in effect.

Per the Contract and Lease, as amended by the Amendment to Contract and Lease, Appellees mined clay from the Plant Site, the Adjacent Parcels, and other nearby property, processed the clay into various products at the Plant Site, and paid the Paragraph Seven Royalty to Blue Mountain until 2001. During this time, all of the clay on the Plant Site and the Adjacent Parcels was depleted. As of this case's filing, Appellees used the Plant to process clay from the Callicutt leases.

In 2001, Appellees gave notice to Vernon Buchman that Appellees would not renew the Contract and Lease on its anniversary date, October 27, 2001. Pursuant to this notice, Appellees believed that the Contract and Lease, and all obligations to pay royalties to Blue Mountain as described therein, including the Paragraph Seven Royalty, were no longer in effect. Appellees, therefore, ceased payment of the royalties and ceased using the Leased Properties for any purpose.

Blue Mountain disputes, however, that the notice terminated the Contract and Lease and Appellees' obligation to pay royalties thereunder. Moreover, Blue Mountain argues that Appellees' obligation to pay the Paragraph Seven Royalty continued in effect despite the rest of the Contract and Lease not having been renewed. Alternatively, Blue Mountain claims that Appellees are obligated to continue paying royalties under the Semmes/Pollard Royalty Agreement.

## II. Analysis

4

### *a. Standard of review and applicable law*

"We review the granting of summary judgment de novo, applying the same criteria used by the district court in the first instance." *Clift v. Clift*, 210 F.3d 268, 269-70 (5th Cir. 2000). "Summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Id.* at 270 (internal quotation and citations omitted).

We apply Mississippi substantive law to this breach of contract dispute. *See H.E. Butt Grocery Co. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA,* 150 F.3d 526, 529 (5th Cir. 1998).

"The most basic principle of [Mississippi] contract law is that contracts must be interpreted by objective, not subjective standards. A court must effect 'a determination of the meaning of the language used, not the ascertainment of some possible but unexpressed intent of the parties.'" *Cherry v. Anthony, Gibbs, Sage*, 501 So. 2d 416, 419 (Miss. 1987) (quoting *Hunt v. Triplex Safety Glass Co.*, 60 F.2d 92, 94 (6th Cir. 1932)). "[O]ur concern is not nearly so much what the parties may have intended as it is what they said, for the words employed are by far the best resource for ascertaining intent and assigning meaning with fairness and accuracy." *UHS-Qualicare v. Gulf Coast Comm. Hosp.*, 525 So. 2d 746, 754 (Miss. 1987).

"When a written instrument is clear, definite, explicit, harmonious in all its provisions, and is free from ambiguity, a court in construing it will look solely to the language used in the instrument itself. In such a case a court will give effect to all parts of the instrument as written." *Pfisterer v. Noble*, 320 So. 2d 383, 384 (Miss. 1975). Additionally, when multiple, related writings evidence a single transaction, "all [of the writings] must be considered together in order

5

to determine the intention of the parties as finally arrived at." *Gilchrist Tractor Co. v. Stribling*, 192 So. 2d 409, 4127 (Miss. 1966).

### b. The Paragraph Seven Royalty

*1. The expiration of Appellees' obligation to pay the Paragraph Seven Royalty*

### A. The term of the Paragraph Seven Royalty

Blue Mountain argues that part of the consideration for the Contract and Lease was a perpetual royalty created in Paragraph Seven. Paragraph One of the Contract and Lease, however, states that the Contract and Lease is effective for an initial ten-year period, with the option to renew the contract yearly if Defendants continued to pay the minimum royalties. Nothing in Paragraph One or Paragraph Seven, or any other provision of the Contract and Lease, Bill of Sale, or Warranty Deed, contemplates that Paragraph Seven would continue in effect even after the expiration of the Contract and Lease of which Paragraph Seven was a part.

Paragraph One states that "the terms of this Lease shall be for a period of TEN (10) years. . ." It does not state that the *Contract and Lease*, as the document was titled, extends for a period of ten years, renewable year-to-year thereafter. That the "Lease" in Paragraph One does not refer to the entire Contract and Lease is the lynchpin of Blue Mountain's argument that the district court misconstrued the term of the Paragraph Seven Royalty.

Paragraph Seven, however, indicates that the Paragraph Seven Royalty is part of the lease agreement. It is the "Lessee" who is to pay the "Lessor" the royalty payments under the paragraph. If the Paragraph Seven Royalty was intended to continue after the leasehold expired, the parties would not have used these terms. After the leasehold expired, Blue Mountain and Appellees would not be in a Lessor/Lessee relationship. The Contract and Lease uses the terms

6

and phrases "Lease," "this contract," and "Lease Contract" interchangeably. We are able to "affect a determination of the language used" and may not consider Blue Mountain's alleged unexpressed intention that the Paragraph Seven Royalty continue in perpetuity. *See Gulfside Casino*, 757 So. 2d at 257. We hold that, read as a whole, all of the provisions of the Contract and Lease, including Paragraph Seven, are subject to the ten-year initial period and year-to-year renewal contemplated in Paragraph One.[7] That is, Paragraph One and Paragraph Seven are not ambiguous.

## B. The expiration of the Contract and Lease

Because we hold that the ten-year term, renewable year-to-year thereafter, applies to Paragraph Seven, we review the district court's determination of when the Contract and Lease expired. The text of the Contract and Lease, especially Paragraph One, indicates that it was not a contract with an indefinite duration, subject only to termination under specific circumstances. It was a term contract granting Appellees an option to renew. That is, it was self terminating unless Appellees continued to pay the minimum royalties. If Appellees did nothing, the Contract and Lease was not renewed.

Blue Mountain argues that the Court should look backward and determine that, because the minimum royalty payments were made in the year preceding the 2001-02 contract year, the contract remained in effect for the following year. It follows, Blue Mountain argues, that Appellees would be obligated to pay at least the minimum $6,000 royalty over the course of the next year. This logic, however, is flawed. If royalties paid in the previous year renewed the

---

[7] This reasoning necessarily also means that, despite Blue Mountain's argument to the contrary, the Amendment to the Contract and Lease, as an amendment unrelated to the term clause and without its own term clause, also was subject to the Contract and Lease term.

contract for the current year, payment would again be owed for the current year.   Payment for the current year as would be required under Blue Mountain's reading of the agreement, would extend the contract for the next year, and so on, in perpetuity.

In this case, Appellees notified a successor of Blue Mountain that they intended to let the Contract and Lease expire.  Whether that act would have been sufficient to terminate a self-renewing contract of indefinite duration is irrelevant here.  Nothing indicated that Appellees sought to renew the contract for another year.  As such, the district court was correct that the contract ended on October 27, 2001, the completion of the last year-to-year term for which the contract was renewed.

2. *The alleged ambiguity and the requested introduction of parole evidence*

In an attempt to avoid the text of the relevant sections of the Contract and Lease, Paragraph One and Paragraph Seven, Blue Mountain claims that there is an ambiguity in another section of the Contract and Lease.  Because of the ambiguity, Blue Mountain argues, parole evidence may be introduced that purportedly indicates that the Paragraph Seven Royalty was to be paid in perpetuity.  The proffered ambiguity, however, is unconvincing.

Blue Mountain argues that the three documents only recite nominal consideration.  As such, Blue Mountain argues, the consideration term is ambiguous.  Only one dollar and other "good and valuable consideration" is mentioned in the second unnumbered paragraph of the Contract and Lease.  In the same sentence, the parties indicate that the consideration is "the mutual covenants and agreement herein contained."  Nothing points to any consideration not contemplated in the three instruments.

Even if the other "good and valuable" consideration phrase is ambiguous, and, as Blue

8

Mountain argues, we may consider parole evidence to resolve that ambiguity, we nonetheless may not consider parole evidence that contradicts unambiguous sections. "[A]t most this means that parol evidence is admissible on those points where there is ambiguity. Such evidence may not be received to contradict parts of the [contract] that are not ambiguous." *Busching v. Griffin*, 542 So. 2d 860, 865 (Miss. 1989).

The specific parole evidence Blue Mountain seeks to have considered is an affidavit made by a party to the case that is properly characterized as a party's interpretation and understanding of the Contract and Lease. The affidavit specifically addresses the Paragraph Seven Royalty, and therefore, also implicates the term limitations of Paragraph One.[8] Because, as discussed earlier, we find these sections of the Contract and Lease to be unambiguous, we may not consider parole evidence that would contradict them. *See Id*.

### c. The Semmes/Pollard Royalty Agreement

#### 1. The Semmes/Pollard Royalty does not "touch and concern the land"

Blue Mountain alternatively argues that, even if the Appellees were not obligated to pay the Paragraph Seven Royalty after October 27, 2001, Appellees were still obligated to pay the Semmes/Pollard Royalty.

The parties agree that this issue is controlled by *Vulcan Materials Co. v. Miller*, 691 So. 2d 908 (Miss. 1997). The district court relied on *Vulcan Materials Co.* in holding that the Semmes/Pollard Royalty was a personal covenant between Blue Mountain and Semmes/Pollard and not a covenant running with the land.

---

[8] We note that, in its brief, Blue Mountain characterized the affidavit as an "Aid In Determining The Duration Of The Paragraph 7 Royalty." Appellant's Brief at 23. Blue Mountain does not claim that the affidavit supports an agreement separate from that contemplated in the Contract and Lease.

9

Under Mississippi law, "[a]ll covenants having to do with realty or the use thereof are either real or personal." *Vulcan Materials Co.*, 691 So. 2d at 913. "A real covenant binds the heirs and assigns of the original covenantor, while a personal covenant does not, except in certain circumstances where those who take land have notice of restrictive covenants pertaining to it." *Id.* at 914.

To create a real, rather than personal, covenant, three criteria must be met: (1) the covenanting parties must have intended to create a real covenant; (2) privity of estate must exist between the person claiming the right to enforce the covenant and the person upon whom the burden of the covenant lies; and (3) the covenant must 'touch and concern' the land in question. *Id.* To meet the requirement that the covenant touch and concern the land, it "must be so related to the land as to enhance its value and confer a benefit upon it, or, conversely, impose a burden on it." *Id.*

"*A covenant that imposes a burden on real property for the benefit of the grantor personally does not follow the land into the possession of an assignee, for such a covenant is personal to the grantor and does not run with the land*, although the deed may expressly state that the covenant runs with the property." *Id.* (emphasis in original) (citation and quotation omitted). Because the agreement to pay royalties in this case, like that in *Vulcan Materials Co.*, creates only a benefit personal to Semmes/Pollard, Appellees would have had to assume the obligation for it to apply in this case. *See Id*. ("Since the burden that would be placed on the [...] property by the royalty agreement would not enhance its value or render the property more beneficial or convenient to its owner or occupant and instead merely imposes a benefit for Miller personally, the covenant does not run with the land. Thus, Vulcan would have had to assume the

10

obligation to pay the royalty to Miller."). The obligation does not "run with the land" per Mississippi law and, therefore, fails on the third prong of the test used to determine whether a covenant is a real covenant or merely a personal covenant.[9]

### 2. *The Semmes/Pollard Royalty was not assumed by Appellees*

We next must determine whether Appellees assumed the obligation to pay the royalty agreement. The district court held that Blue Mountain "presented no evidence whereby any successor or assignee of Appellees expressly assumed the obligation to pay the Semmes/Pollard Royalty, nor any evidence whereby any Defendant has done so." Op. and Order of Mar. 18, 2003 at 22.

Paragraph Six of the Warranty Deed, however, states that the conveyance of the Plant Site "is made subject to a lien and royalty contract entered into by and between [Blue Mountain] and [Semmes/Pollard]. . ." Further, Paragraph Seven states: "should [Blue Mountain], at any time, fail to pay royalties as due, which are provided for in said Semmes and Pollard document hereinbefore referred to, that upon notice of this fact being brought to the attention of [Appellees], [Appellees] may make payment of such amount as is actually due thereunder. . ." As the district court noted, the Warranty Deed Paragraph Seven language is permissive, not mandatory.

Paragraph 6 of the Warranty Deed, however suggests that Appellees were at least on

---

[9] Blue Mountain claims that the covenant concerned only land previously owned by Semmes/Pollard. Appellees' claim, and the district court held, that the Semmes/Pollard Royalty necessarily concerns property that was never owned by Semmes/Pollard or Blue Mountain. This distinction is irrelevant, however, because regardless of what property is concerned, the benefit of the Semmes/Pollard Royalty is personal to Semmes/Pollard. The "touch and concern" requirement, therefore, has not been met.

11

notice of the personal covenant to some degree, even if Appellees could offset any payment to Semmes/Pollard by subtracting the amount paid from royalties otherwise owed to Blue Mountain. Appellees, however, did not expressly assume the obligation. This aspect differs materially from that in *Vulcan Materials Co.* where the purchaser of the property was on notice and expressly assumed the covenant. *Vulcan Materials Co.*, 691 So. 2d at 915. The deed in question in *Vulcan Materials Co.* had language noting the royalty agreement and indicating that the property was the purchaser's "[t]o have and to hold [...], with the exceptions of [...] certain unrecorded Limestone Royalty Agreement executed by and between Grantor and Real Estate Leasing Co., Inc., [...] including, without limitation, Grantee's extraction and removal of stone or other products thereof (*which obligations or liabilities Grantee hereby assumes upon acceptance of this Deed*), Grantor warrants specially to Grantee the real property conveyed hereby." *Id.* at 914-15.

Moreover, we note that Blue Mountain does not claim that the language in Paragraph Six of the Warranty Deed is a sufficient basis upon which to find that Appellees assumed the obligation to pay Semmes/Pollard Royalty. Though the Warranty Deed does state that the conveyance "is made subject to a lien and royalty contract," when read as a whole, the Warranty Deed language indicates that Blue Mountain retained the obligation to pay the Semmes/Pollard Royalty.

Accordingly, the district court's holding that the Semmes/Pollard Royalty was not a real covenant, but rather a personal covenant was correct. Further, Appellees did not assume the obligation of the Semmes/Pollard Royalty and, therefore, are not liable for its payment.

### d. Issues unresolved by the district court

Blue Mountain argues that, even if the Paragraph Seven Royalty terminated on October

12

27, 2001, Appellees owe Blue Mountain Paragraph Seven Royalty payments for products manufactured from clay mined prior to this date. The district court does not appear to have addressed this issue. This issue necessarily raises questions of fact. We think it appropriate to allow the district court an opportunity to determine the materiality and disputedness of the relevant facts. Accordingly, we must vacate the judgment of the district court to the extent the judgment foreclosed this claim without analysis, and we remand for disposition of this claim.

### III. Conclusion

Appellees' obligation to continue paying the Paragraph Seven Royalty ceased with the expiration of the Contract and Lease. The undisputed facts support a conclusion that the Contract and Lease terminated on October 27, 2001. Additionally, Appellees were not obligated to pay any royalties pursuant to the Semmes/Pollard Agreement. There are, therefore, no material facts in dispute with regard to these issues, and Blue Mountain cannot recover on these claims as a matter of law. Summary judgment in favor of Appellees with respect to these claims was appropriate. Accordingly, we affirm the district court's judgment to the extent it disposed of these claims. We vacate the district court's judgment in part and remand for further proceedings for the limited purpose of resolving Blue Mountain's claim that Appellees owe royalty payments for clay mined prior to October 27, 2001.

AFFIRMED IN PART, VACATED and REMANDED IN PART.